UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LENORE ELLEN WALTERS,

        Plaintiff,                                Hon. Janet T. Neff

v.                                                    Case No. 1:19-cv-377

CHALLENGE MANUFACTURING
COMPANY,

        Defendant.
_____/

### REPORT AND RECOMMENDATION

This matter is before the Court on Defendant's Motion for Summary Judgment. (ECF No. 40.) The motion is fully briefed and ready for decision. Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendant's motion be **GRANTED**.

### I.    BACKGROUND

Plaintiff Lenore Walters filed a pro se complaint against her employer, Defendant Challenge Manufacturing Company, alleging claims of hostile work environment and retaliation based on her age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.* Walters remains employed by Challenge.

Challenge is engaged in the business of automotive manufacturing at various locations in the United States and Mexico. Challenge hired Walters in March 2015 at its facility in Holland, Michigan, to work as a Quality Inspector at the rate of $10 per hour. (ECF No. 40-2 at PageID.278–79.) Walters performed well during her first year of employment and received several pay raises and a promotion to Quality Team Leader. (*Id.* at 262–63.)

1

### A. Walters Is Hired as a Trainer

In July 2016, Walters was invited to apply for a Trainer position in Challenge's newly-created training department. (ECF No. 40-3 at PageID.325–26.) Walters was selected for the position on August 1, 2016, at a wage of $17 per hour. (ECF No. 40-2 at PageID.317.) Trainers were primarily responsible for conducting training sessions for all Challenge personnel, including direct hires and contract workers, at all levels, to provide them with the knowledge they would need for their experiences in the plant. (ECF No. 40-4 at PageID.374.) Walters and the other Trainers on the team—Jacklyn Batista, Cristi Van Klompenberg and Alma Perez—were supervised by Training Coordinator Larne Wright. (ECF No. 40-3 at PageID.326–27.) Walters and Batista worked together on first shift and Van Klompenberg and Perez worked together on second shift. (*Id.* at PageID.328.)

According to Walters, she had a difficult relationship with Van Klompenberg even before they worked with each other in the training department. When Walters first started at Challenge, Van Klompenberg had yelled at her, and Walters felt that Van Klompenberg disliked her. (*Id.* at PageID.323–24, 327–28.) Otherwise, Walters believed that she had a good relationship with the other team members, particularly Batista, whom Walters had recommended for the position. (*Id.* at PageID.327–28.) Batista held a different view. Although Batista tried to get along with Walters from the beginning, she soon found Walters difficult to work with as Walters acted like Batista's boss, told her what to do and would get mad easily if she did not get her way. Batista also did not appreciate Walters complaining about Wright and the other team members behind their backs. (ECF. No. 40-5 at PageID.380.) In January or February 2018, Batista asked to work third shift because she could no longer work with Walters. (*Id.*)

In Walters's six-month review, Wright gave her "outstanding" ratings in all categories except "attitude," which he rated as "average." Wright commented:

> She has become better at presentation skills and disseminating info to others. I would caution sometimes may seem to others as condescending. Just be aware when communicating to others. Her work ethic and dedication are well above others. I would also caution that she o [sic] deal with conflict with in [sic] the team first. Find ways to work more closely with others. This has improved as of recent and continues to get better. Overall Lenore is an asset to the team and should be recognized and rewarded.

(ECF No. 40-6 at PageID.385.) In response, Walters wrote: "Glad it has been brought to light that I have been the recepiant [sic] of negative and condecending [sic] people and I have taken steps to correct my reaction." (*Id.*)

In July 2017, Chris Booth replaced Wright as Training Coordinator at the Holland plant. He was 54 years old at the time—approximately four years younger than Walters. (ECF No. 40-7 at PageID.390.) Booth moved to the Holland facility from another Challenge facility where Challenge's then-Director of Training, George Haddad, also worked. (*Id.* at PageID.392.) Based on Haddad's comments, Booth learned that Walters often bypassed her supervisor and went to higher management when she had complaints or suggestions about the training program. (*Id.* at PageID.392–93.) When Booth transferred to the Holland facility, he was instructed to make changes to the program, including taking a more active role in handling issues at the plant level, decreasing overtime, and possibly eliminating a Trainer position. Booth informed the team of these changes, including an expected decrease in overtime and the possible elimination of a Trainer position. (*Id.* at PageID.391.) Booth also informed the team that he would be focusing on teamwork and building consensus. This was particularly an issue with Walters, as Mike Swartz, Challenge's Program Director, told Booth that, while Walters was good at her job from a technical standpoint, she had some "rough edges" when it came to working with others. (*Id.*)

Walters thought that Booth acted "horrible" towards her almost from the start. She claims that Booth told her to let go of, or forget, her "old ways," which she perceived as an age-based comment. Booth's teasing about Walters's computer skills also offended her. For example,

3

when Walters had a problem with her computer, Booth said, "It's not the computer. It's the operator." (ECF No. 40-3 at PageID.331–32.) Walters told Booth that his comments "deeply bothered" her and she did not appreciate them. (*Id.* at PageID.331.) Booth did not infer that Walters's complaints were about age, but instead thought that she was upset because he was saying that she did not like change and was insulting her about her computer abilities. (ECF No. 40-7 at PageID.392.)

In early August 2017, shortly after Booth became the Training Coordinator, Walters learned that Booth had been altering her co-workers' timecards to excuse their absences or late arrivals. Booth's practice bothered Walters because it made her co-workers eligible for Challenge's "perfect attendance" bonus, which Walters had to work hard to earn every year. (ECF No. 40-3 at PageID.333.) On August 2, 2017, Walters contacted Darlene Ellis-Compeau, the Human Resources Manager at the Holland facility, to discuss some concerns she had about Booth. Ellis-Compeau met with Walters on August 4, 2017. During their meeting, Walters said that she believed that Booth's "old ways" and computer skills comments constituted age discrimination. Ellis-Compeau told Walters that she did not believe Booth's comments pertained to age, but Walters disagreed. (ECF No. 40-9 at PageID.403; ECF No. 40-3 at PageID.335.) Walters also mentioned her concern about Booth's practice of altering team members' timecards. Ellis-Compeau agreed that the practice was improper, and Booth should stop it. (ECF No. 40-3 at PageID.334–35; ECF No. 40-9 at PageID.403.) Following the meeting Ellis-Compeau spoke with Booth and told him to stop changing timecards and making comments to Walters about her computer skills. Ellis-Compeau also recommended that Booth not "coach" Walters on her attitude because she likely would not appreciate his efforts. Because Ellis-Compeau believed that Booth's comments to Walters were not age-related, she did not tell him that Walters had

4

complained about age discrimination. (ECF No. 40-9 at PageID.403.) Walters confirmed that after she spoke with Ellis-Compeau, Booth's comments about her "old ways" "slow[ed] down[;] . . . it was almost like then he would like catch himself after saying it, and then he'd change the subject." (ECF No. 40-3 at PageID.336.)

Soon after Booth became Walters's supervisor, he spoke to her about the need to follow the "chain of command" in voicing any concern or complaint that she had, *i.e.*, she should bring them to Booth.[1] (ECF No. 40-7 at PageID.393.) Nonetheless, Walters continued to bypass her supervisor. On August 30, 2017, she sent an email to the Assistant Plant Manager about a student in her class and removed Booth from the email chain, even after the Assistant Plant Manager added Booth to the email conversation so that Booth could provide support. Booth did not discipline Walters for this incident, but he did remind her about bringing her concerns to him. (*Id.*) Nonetheless, Walters engaged in the same conduct again on September 19, 2017, when she complained to the Director of Training about Batista wanting to prioritize a different training than the Director of Training had wanted and told him that she now had less time to prepare for training classes because of changes that had been made in the department. (*Id.*) Because Booth had warned Walters several times that she should bring her concerns directly to him, he issued Walters a written reprimand. (*Id.*; ECF No. 40-2 at PageID.256.) In response, Walters sent an email to Mike Tomko, Challenge's Vice President of Human Resources, "apologiz[ing] for thinking [Challenge] had an open door policy" and requesting to "place a formal complaint against [Ellis-

---

[1] Ellis-Compeau also spoke to Walters during their August 4 meeting about following the "chain of command." Ellis-Compeau told Walters that she could bring any concern about Booth to Ellis-Compeau but that she should address all other issues with Booth in the first instance. (ECF No. 40-9 at PageID.403.)

5

Compeau] and [Booth] . . . for [Ellis-Compeau] allowing rules to be broken and [Booth] breaking the rules." (ECF No. 40-22 at PageID.467.)

Over the following months, Walters regularly complained to Booth about her frustrations with him and her coworkers. (ECF No. 6-1 at PageID.42; ECF No. 40-7 at PageID.393.) The other team members complained about Walters. (*Id.*; ECF No. 40-05 at PageID.380.) In March 2018, Walters complained to Ellis-Compeau that Van Klompenberg was harassing her. Ellis-Compeau investigated and learned that Van Klompenberg and another team member claimed that it was Walters, not VanKlompenberg, who was being critical, rude, and condescending toward the rest of the team. Ellis-Compeau found no indication of illegal harassment and could not substantiate Walters's complaint. (ECF No. 40-9 at PageID.404.)

### B. Walters Is Transferred out of the Training Department

On June 25, 2018, Ellis-Compeau received a complaint about Walters from OnStaff—a staffing company that provided temporary contract employees to Challenge—concerning her conduct during a training session. The OnStaff representative explained that a new employee reported that during a new hire training session, the trainer (who was Walters) had disparaged Challenge and said, "run while you can." The following day, Ellis-Compeau interviewed individuals who had been in the training session. They consistently reported that Walters was rude and unprofessional. For example, she told one trainee that she was going to call him "you" because she could not pronounce his name. The trainees also reported that Walters gave them the impression that they would be fired if they made a mistake or would lose their job because the plant was losing contracts with customers. (ECF No. 40-9 at PageID.404.) Ellis-Compeau discussed her findings with Tomko. They agreed that Walters could not remain a Trainer and

considered discharging her due to misconduct, but instead decided to try to find her another position at the Holland plant. (*Id.* at PageID.405.)

After reviewing available positions and department needs, Ellis-Compeau determined that the CMM Lab, which was part of the Quality Department, was understaffed and could use some help so she spoke with Shawn Cooper, who managed the CMM Lab, and Yolanda Bonds, the Quality Manager. (ECF No. 40-9 at PageID.405.) Initially, Cooper was not receptive to taking Walters on because he needed CMM programmers, and Walters was not trained in that area. Cooper told Ellis-Compeau that he did not need anyone with Walters's skillset, but Bonds agreed with Ellis-Compeau that Walters could provide support in other ways. (*Id.*) Cooper also heard from Batista that Walters could be difficult. (ECF NO. 40-10 at PageID.412.) Ultimately, Cooper agreed to have Walters join the CMM Lab team. Her pay did not change because of the reassignment. (ECF No. 40-9 at PageID.405.)

Cooper assigned Walters to clean and check gauges in the CMM Lab and eventually on the plant floor. Soon after Walters began working in the CMM Lab, Cooper noticed that Walters pushed back on every process that had been in place and insisted on creating her own processes. Walters also insisted on revising forms that other employees had created over the years, which caused "little grievances" by several members of the team. (ECF No. 40-10 at PageID.412; ECF No. 40-11 at PageID.415–16.) Walters also frustrated Cooper with constant requests for training and different assignments, such as "cut and etch" and "pull test" work, when she had not successfully completed the tasks she had been assigned. (ECF No. 40-10 at PageID.412.) Eventually, Ellis-Compeau helped Walters get the "cut and etch" and "pull test" training that she sought. (ECF No. 40-9 at PageID.405.)

### C. Walters Moves to Other Positions

Walters remained part of the CMM Lab team for several months until she injured her knee in an accident while checking gauges on the plant floor. (ECF No. 40-3 at PageID.358–59.) She was restricted to a sit-down job and, therefore, was assigned to the rework area, where she sat on a tote and checked welds. (*Id.* at PageID.359.) Although Walters believed that she should have remained in the CMM Lab to be trained as a CMM programmer, Cooper had made clear to Walters that he wanted to hire an experienced CMM programmer and was not looking to train someone to do that job. (*Id.*; ECF No. 40-10 at PageID.413.)

In December 2018, after Walters had spent a couple of weeks in rework, Ted Mattis, the new Quality Manager, assigned Walters to an Inspection position in the Steel Receiving area, where she checked and labeled steel coils that were delivered to Challenge. (ECF No. 40-8 at PageID.398.) In her new position, Walters worked closely with Dave Antonson, the Steel Crane Operator in the Press Department. According to Walters, Antonson was initially glad to have Walters working with him, but his attitude changed after he spoke with Booth, and he no longer wanted to work with her. (ECF No. 40-3 at PageID.351.) Walters even claimed that Antonson swung a steel coil over her head on purpose. (ECF No. 7-1 at PageID.66.) Antonson saw things differently. He tried to explain how things should be done so that they could work safely. (ECF No. 40-12 at PageID.417.) He observed that Walters would regularly stand in his way or too close to the crane, and she became defensive when he told her to stand back out of his way. (*Id.* at PgeID.418.) Walters also argued with him about whether the weight of the coils should be marked in kilograms or pounds. (*Id.*) Antonson denies intentionally moving a coil over Walters's head, but he asserts that if it happened, it was because she was standing too close, and he did not see her. (*Id.*)

8

In 2019, the Quality Department eliminated Walters's position in the Steel Receiving Department and a comparable position in Component Receiving because Challenge was using certified suppliers, and the two positions were redundant. (ECF No. 40-8 at PageID.399.) Walters was moved to the rework/nonconforming materials area on a temporary basis while Human Resources worked on finding Walters a long-term position. (ECF No. 40-3 at PageID.363; ECF No. 40-13 at PageID.420.) While working in that area, Walters complained that her co-worker, Vickie Hill, was subjecting her to a "hostile work environment." Hill acknowledged that she and Walters "butted heads" over different tasks or processes because Walters wanted to do things her own way and control everything. (ECF No. 40-14 at pageID.424.) Mattis's and Hill's supervisor, Larry Bulson, attempted to mediate the situation between Walters and Hill, but agreed that both were responsible for the conflict. (ECF No. 40-8 at PageID.398–99.)

In early May 2019, Mattis and Human Resources Manager Susan Waha (who had replaced Ellis-Compeau), met with Walters to discuss assigning her to a new position. Waha, who was new to Challenge, had no previous experience with Walters but had a difficult time trying to find a placement for Walters because of her reputation for creating conflict with other employees. (ECF No. 40-13 at PageID.421.) Waha found two positions, one driving a Hilo in the Press Department and the other in the Weld Department. Walters declined the position in the Weld Department because it would have been too hard on her knee. She also did not want the position in the Press Department and instead stated that she wanted to return to the Quality Department or Steel Receiving, but Mattis and Waha explained that those departments had no open positions. They also told Walters that her pay would stay the same. (ECF No. 40-8 at PageID.399; ECF No. 40-13 at PageID.421.) In the hope of encouraging Walters to change her behavior and improve

9

her relationships, Waha told Walters that she had had a difficult time trying to find an assignment for Walters because supervisors were wary of her reputation as a difficult employee. Walters took offense and insisted that everyone liked her until Booth (whom she referred to as "the devil") came along and said bad things about her. (*Id.*)

Walters accepted the position in the Press Department, where Larry Whitfield was her supervisor and Larry Bulson was her manager. (ECF No. 40-3 at PageID.365; ECF No. 40-16 at PageID.429.) Walters's relationship with her co-workers in the Press Department followed a similar pattern as her relationships in her prior positions. Initially, relationships with her co-workers were good, but eventually things soured, this time because, according to Walters, Vicki Hill had spread rumors that Walters was "trouble." (ECF No. 40-3 at PageID.366–67; ECF No. 40-15 at PageID.426.) Some of the conflict arose from Walters's refusal to follow the Press Operators' established procedures and her creation of her own procedures. For example, as the Hilo driver, Walters was responsible for ensuring that the Press Operators had the materials they needed to do their jobs, including the correct gauges and containers. When the Press Operators would get down to between 500–1000 parts, they would decide what they needed for their next job and write it down on a piece of paper and give it to the Hilo driver. (ECF No. 40-18 at PageID.446.) Instead of following that process, Walters reviewed the upcoming jobs for that day on the computer and made her own list of parts the Press Operators needed. (*Id.*) This created a problem for the Press Operators because the priority of the jobs changed frequently throughout the day, and the information on the computer rarely reflected what they actually needed. Consequently, the presses would be idle more frequently. (*Id.*) Walters routinely complained to Whitfield and Bulson about "harassment" from her co-workers. Whitfield believed that Walters

was a hard worker but that she "was in over her head driving a Hilo in such a busy area . . . [and] could not keep up."  (ECF No. 40-16 at PageID.428.)

In late 2019 or early 2020, Whitfield offered Walters a different Hilo driver assignment that was not as fast paced as her assignment working with the Press Operators.  Instead, she would be responsible for dumping scrap and working primarily with one other co-worker who was known for getting along well with everyone.  (*Id.* at PageID.429.)  Walters accepted the position.  In February 2020, Whitfield promoted Walters to the position of Scrap Coordinator.  (*Id.*)

## II.     MOTION STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Material facts are facts that are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III.    DISCUSSION

Challenge interprets Walters's complaint and statements as alleging claims of age-based hostile work environment and retaliation in violation of the ADEA.  Based on its review of Walters's complaint, her deposition testimony, and her response to Challenge's motion, the Court determines that Challenge accurately summarizes Walters's claims.

11

### A. Walters's Response

Before turning to the claims, the Court briefly addresses Walters's response to Challenge's motion. Because Walters is a pro se plaintiff, the Court is required to liberally construe her pleadings. *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam) (stating that pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers"). But Walters's pro se status does not excuse her failure to comply with applicable court rules. "While pro se litigants are afforded significant leeway, those who proceed without counsel must still comply with the procedural rules that govern civil cases." *Frame v. Superior Fireplace*, 74 F. App'x 601, 603 (6th Cir. 2003) (internal citations omitted). Walters did not submit an affidavit or a declaration in support of her response, nor has she presented any admissible evidence to refute Challenge's evidence in support of its motion. Walters' response, in large part, consists of arguments which are not particularly responsive to Challenge's proffered legal bases for its actions and which do not qualify as evidence. *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006). Therefore, the Court must decide the motion based upon the evidence that Challenge has presented and that is otherwise in the record.

Walters also requests that the Court allow her to proceed to trial, where she says she will present witnesses to support her claims. At the summary judgment stage, a court is not free to permit a non-moving party to proceed with her claims on a promise that evidence will be forthcoming at trial. Instead, summary judgment is the time at which a plaintiff must show her hand, so to speak, so that the court and the opposing party can discern in advance if an issue of fact truly remains for trial. Stated differently, "a motion for summary judgment is a means by which to challenge the opposing party to put up or shut up on a critical issue." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995) (internal quotation marks omitted).

**B.     Hostile Work Environment Based on Age**

To establish a prima facie case of hostile work environment based on age, a plaintiff must show that "(1) [s]he was 40 years or older at the time of the alleged harassment; (2) [s]he was subjected to harassment, either through words or actions, based on h[er] age; (3) the harassment unreasonably interfered with h[er] work performance and created an objectively intimidating, hostile, or offensive work environment; and (4) there is some basis for liability on the part of the employer." *Brown v. Metro. Gov't of Nashville & Davidson Cty.*, 722 F. App'x 520, 525 (6th Cir. 2018) (citing *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834–35 (6th Cir. 1996)). To constitute an actionable hostile environment, the harassment must be "so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)) (internal quotation marks omitted). In determining whether an environment is sufficiently "hostile" or "abusive," a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "'Simple teasing,' offhand comments, and isolated incidents (unless extremely serious)" do not amount to a hostile work environment. *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 82 (1998)).

Walters's hostile work environment claim is based solely on Booth's comment that she needed to change her "old ways" and his teasing about her computer skills when her computer was not working. But these comments do not demonstrate age-based animus, as Walters claims. The phrase "old ways," particularly when used in the context of an individual's need for change, refers not to person's age, but to his or her former way of doing things. Such references do not connote

13

age. For example, in *Peecook v. Northwestern National Insurance Group*, No. 96-4318, 1998 WL 476245 (6th Cir. Aug. 3, 1998), the Sixth Circuit held that the comment "perhaps you are too old to change" was "innocuous" and "too amorphous to constitute age-based 'harassment.'" *Id.* at *3. Similarly, in *Pearson v. City of Manhattan*, 33 F. Supp. 2d 1306 (D. Kan. 1999), the court observed that "not every reference to the word 'old' indicates that the person speaking is talking about a person's age." *Id.* at 1315. The court said that "[t]erms such as 'old boys' club' and 'old ways' apply more to a person's state of mind than to a person's age." *Id.*; *see also Martin v. Ryder Distrib. Res., Inc.*, 811 F. Supp. 658, 661 (S.D. Fla. 1992) (holding that an executive's references to a group of age-protected employees as "good old boys" and "old-fashioned" only characterized the individuals and did not refer to their age). Similarly, Booth's alleged teasing about Walters's computer skills ("it's not the computer, it's the operator") had nothing to do with her age. In *Novara v. SpartanNash Associates, LLC*, No. 1:16-CV-838, 2017 WL 4285439 (W.D. Mich. Sept. 27, 2017), the plaintiff's supervisor told him, "People from our generation have a hard time with computers. I do myself, but you just have to keep doing it until you get it." *Id.* at *5. The court found nothing discriminatory about the statement, noting that it expressed both empathy and encouragement to the plaintiff for his struggles with using computers. *Id.*; *see Eckhardt v. NSI Elec. Contractors, Inc.*, No. 03-C-1465, 2005 WL 1387625, at *14 (E.D. Wis. June 9, 2005) ("Identifying a deficiency in computer skills would be a merits-based decision, not an age-based decision, even if that factor tended to encompass more older workers."). Here, while Booth was not expressing empathy, his comment nonetheless lacked any indicia of age-based animus.

Walters's hostile work environment claim also fails because she cannot establish the third prong of her claim—that she was subjected to severe and pervasive harassment that created a hostile or offensive work environment. As noted above, Walters identifies only two instances of

age-related comments (which the Court has found do not relate to age), which occurred during a brief period. Moreover, Walters has not shown that Booth's comments "unreasonably interfered with [her] work performance *or* created a hostile or offensive work environment that was severe and pervasive." *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 830 (6th Cir. 1999) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)). Although Walters complains about other instances of harassment by her coworkers, she offers nothing to link them to age. Personality conflicts with coworkers and managers do not suffice to establish a hostile work environment claim under the ADEA. *See Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *Peecook*, 1998 WL 476245, at *3 ("Personality conflicts, alone, will not support an ADEA claim.").

### C. Retaliation

The ADEA prohibits an employer from retaliating against an employee for opposing or reporting age discrimination. 29 U.S.C. § 623(d). To establish a prima facie case of retaliation, a plaintiff must show: "(1) that the plaintiff engaged in a protected activity; (2) that the defendant had knowledge of the plaintiff's protected conduct; (3) that the defendant took an adverse employment action towards the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002). As to causation, a plaintiff must show that her participation in the protected activity was a "but for" cause of the employer's adverse employment action. *University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013). If the plaintiff establishes a prima facie case of retaliation, the defendant must then "offer a non-discriminatory reason for the adverse employment action." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012) (internal quotation marks omitted). If the defendant meets his burden, the plaintiff must "demonstrate that the proffered reason was mere pretext." *Id.* (internal quotation marks omitted).

Walters fails to establish a prima facie case of retaliation. Walters engaged in ADEA-protected activity twice. First, she engaged in activity under the ADEA's opposition clause, 29 U.S.C. § 623(d), when she complained to Ellis-Compeau in August 2017 about Booth's "old ways" comment and his teasing about her computer skills. Although Walters used the terms "harassment," "retaliation," and "discrimination," or variants thereof on several occasions in complaints about coworkers and supervisors, she did not do so in the context of age discrimination. For example, she complained of Booth "retaliating" against her for reporting his practice of changing her co-workers' timecards to Ellis-Compeau—a violation of company policy, not the ADEA. (*See* ECF No. 6-1 at PageID.18.) Similarly, she characterized Vickie Hill's rudeness towards her as "causing a hostile environment and harassment," but not based on her age. (ECF No. 7-1 at PageID.55.) As for Walters's August 2017 complaint, it is undisputed that Ellis-Compeau did not tell Booth that Walters complained of unlawful age discrimination. (ECF No. 40-9 at PageID.403.) Although Walters told Booth that she did not like his "old ways" comment or being teased about her computer skills, it is also undisputed that Booth did not construe Walters's complaint as having to do with age. (ECF No. 40-7 at PageID.392.) Walters has not shown that any decision-maker, other than Ellis-Compeau, knew that Walters complained about age discrimination. Thus, Ellis-Compeau is the only decision-maker who could have retaliated against Walters. *See Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 560 F. App'x 460, 465 (6th Cir. 2014) (noting that a plaintiff "must demonstrate that the defendant had knowledge of his protected activity prior to taking the adverse employment action"). The only possible adverse action that Ellis-Compeau participated in was the July 2018 decision to transfer Walters from her Trainer position to the CMM Lab based on the OnStaff complaint. While the Sixth Circuit has held that temporal proximity between protected conduct and an adverse employment action may

16

demonstrate a causal connection, the period of time between the two events must be short, "usually less than six months," at least where the plaintiff relies on temporal proximity alone to establish her prima facie case. *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) (internal quotation marks omitted). In *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516 (6th Cir. 2008), the court observed:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Id.* at 525. In *Cooper v. City of North Olmsted*, 795 F.2d 1265 (6th Cir. 1986), the court concluded that "[t]he mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an [inference] of retaliation." *Id.* at 1272. Here, the eleven-month period between Walters's complaint to Ellis-Compeau and her transfer from her Trainer position, alone, is too attenuated to create an inference of retaliation. *See Nolen v. FedEx Servs.*, No. 13-6245, 2014 WL 12887530, at *3 (6th Cir. May 28, 2014) (holding that nine-month period between the plaintiff's protected activity and her termination was "simply too long of a time period for temporal proximity alone to support an inference of retaliation").

Walters's second instance of protected activity was the charge of discrimination she filed with the Equal Employment Opportunity Commission (EEOC) on March 15, 2019. However, Walters fails to identify any decision-maker who had actual knowledge that she filed the EEOC charge. Absent such evidence, she cannot establish a prima facie case. The only employment actions that took place after that date were Walters's assignment to the Press Department as a Hilo driver and her subsequent reassignment to scrap Hilo driver and promotion to Scrap Coordinator.

17

There is no evidence of record that the individuals involved with these employment decisions—Waha, Mattis, or Whitfield—knew about the EEOC charge.

According, Walters's retaliation claim fails.

## IV.    CONCLUSION

In sum, the record is devoid of evidence showing that Challenge subjected Walters to a hostile work environment or retaliated against her in violation of the ADEA. Instead, the overwhelming weight of the evidence shows that the harassment and retaliation of which Walters complains resulted from personality conflicts between Walters and her co-workers having nothing to do with age and for which Walters was at least partly responsible. Accordingly, for these reasons, the undersigned recommends that the Court grant Challenge's Motion for Summary Judgment (ECF No. 40) and dismiss Walters's complaint with prejudice.

## **NOTICE**

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Dated: June 17, 2020                                     /s/ Sally J. Berens
                                                                         SALLY J. BERENS
                                                                         U.S. Magistrate Judge